THE HONORABLE BRIAN A. TSUCHIDA

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| AARON HERMAN and LEAH HERMAN, a married couple, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AMAZON.COM, INC.,<br><br>Defendant. | NO. 2:26-cv-1674-BAT<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS**<br><br>NOTE ON MOTION CALENDAR: October 2, 2026<br><br>ORAL ARGUMENT REQUESTED |

## I. INTRODUCTION

Amazon's motion is predicated on mischaracterizations of Plaintiffs' claims. Plaintiffs did not expect static prices. Plaintiffs' claims are not premised on an inability to unsubscribe (like Amazon's $2.5 billion Prime settlement with the FTC). Instead, Plaintiffs allege that, from the standpoint of the ordinary consumer, a "Subscribe & Save" program that advertises discounted prices over individual purchases should, in fact, convey savings.

That is not what Subscribe & Save customers get. Amazon induces subscription with artificially low prices and an illustration of how consumers get a better price than the "One-Time



STRITMATTER LAW
3600 15th Ave W, Ste. 300
Seattle, WA 98119
Tel: 206.448.1777

Purchase" price, called the "Featured Offer." Then Amazon increases prices above Amazon.com[1] prices for the same product—higher than new "Subscribe & Save" enrollments and higher than Featured Offer prices used as comparators to illustrate savings via "Subscribe & Save." The Featured Offer prices are also the most customer-preferred offers *by Amazon's own evaluation*. Thus, there should be no dispute that Subscribe & Save customers should not pay more than Featured Offer prices—but they do.

Amazon's Subscribe & Save program is a classic bait-and-switch. Unlike cases Amazon attempts to analogize, this case involves affirmatively misleading representations to consumers. The linked fine print Amazon relies on violates federal standards for subscription disclosures and fails Washington Consumer Protection Act standards to prominently correct a misleading "net impression" of the offering. Worse, Amazon's FAQs, emails, and other publications reinforce the (inaccurate) consumer impression that customers are saving by subscribing.

Finally, Amazon fails to address the increased capacity for deception and injury under the subscription model, recognized by federal law, the FTC, and the CFPB. Consumers fully control one-time purchases. They can vet prices and seek refunds. But there is no disclosure advising consumers they may pay more than Amazon-defined customer-preferred offers in the program billed "Subscribe & Save." The disclosures do not explain how customers may investigate and remedy overpayment on all subscription orders—including past orders—when they realize this deception. The appropriate remedy is before this Court.

Amazon's motion should be denied, or in the alternative, Plaintiffs should be granted leave to amend.[2]

---

[1] Throughout this brief, Plaintiffs use "Amazon" to refer to the Defendant corporation and "Amazon.com" to refer to the Defendant's ecommerce website.
[2] To narrow the issues, Plaintiffs withdraw their request for injunctive relief.



STRITMATTER LAW
3600 15th Ave W, Ste. 300
Seattle, WA 98119
Tel: 206.448.1777

## II. STATEMENT OF FACTS

### A. Amazon's Subscribe & Save Program.

#### 1. Amazon Selects One "Featured Offer" to Recommend to Consumers.

On the Amazon.com store, consumers can purchase products sold by Amazon—*i.e.*, Amazon itself is the seller—and products listed by third-party sellers. Compl. ¶¶ 3.4-3.7. When multiple sellers offer the same product on Amazon.com, those sellers compete for placement in the "Buy Box." *Id.* ¶ 3.41. The Buy Box is the section of a product page through which consumers can add a product to their shopping cart or complete a purchase. *Id.* ¶ 3.42. The Buy Box identifies the seller of the product and the entity responsible for fulfillment of the order. *Id.* When multiple sellers offer the same product, Amazon selects which seller's offer will appear in the Buy Box and calls that listing the "Featured Offer." *Id.* ¶ 3.43. Within the Amazon.com marketplace, selection as the Featured Offer is referred to as "winning" the Buy Box. *Id.*

Amazon states that it selects the Featured Offer by evaluating eligible offers and determining which offer is "the most attractive for the customer" based on factors like product price and shipping costs. *Id.* ¶¶ 3.44-3.45. Sellers that are not selected are relegated to the "Other Sellers on Amazon" section of the product page. *Id.* ¶ 3.46. In *Taylor v. Amazon.com, Inc.,* No. 2:24-CV-00169-MJP, 2025 WL 104381 (W.D. Wash. Jan. 15, 2025), cited by Amazon in its motion, Amazon represented that the Featured Offer is the "one which Amazon 'thinks customers would choose if they compared all offers in detail,' but only when those offers are 'priced well.'" *Id.* *4. In other words, the Featured Offer represents the most customer-preferred offer by Amazon's own standards. Plaintiff alleges that nearly 98% of Amazon sales occur through the Buy Box, demonstrating that consumers understand the Featured Offer to be the most preferable one available for the product. Compl. ¶ 3.47.



STRITMATTER LAW
3600 15th Ave W, Ste. 300
Seattle, WA 98119
Tel: 206.448.1777

**2. Amazon Offers Savings by Subscribing.**

Amazon operates a program called “Subscribe & Save,” through which customers can enroll in recurring deliveries of products they purchase regularly. *Id.* ¶ 3.58. Amazon advertises that subscribers receive automatic discounts of up to 15% compared to a one-time purchase. *Id.* Amazon determines which products are eligible for the program, including products sold directly by Amazon and products sold by third-party sellers. *Id.*

When consumers shop through Amazon’s Subscribe & Save storefront, they are presented with products that Amazon has designated as eligible for the program. *Id.* ¶ 3.59. After selecting an eligible product, consumers are shown two prices on the product page. *Id.* ¶ 3.60. The first is identified as the “One-Time Purchase” price. *Id.* ¶ 3.61. The second is presented as a discounted Subscribe & Save price and is displayed using a strike-through reference price. *Id.*

Amazon represents elsewhere on the product page that the strike-through price is a “One-Time Price” that “refers to the current Featured Offer price for a one-time purchase of the item.” *Id.* ¶ 3.63. Amazon therefore presents consumers with what it labels as a discounted subscription price by reference to another price that it describes as a one-time purchase price for the same product. *Id.* Amazon uses information obtained through its monitoring of third-party marketplace sales and enforcement of marketplace policies, including its Business Solutions Agreement and Marketplace Fair Pricing Policy, to price products sold directly by Amazon. *Id.* ¶¶ 3.64, 3.66.

For example, on the product page for Maxwell House Coffee (ASIN B0CXYYWL6G), Amazon identified itself as the Featured Offer seller and displayed a One-Time Purchase price of $14.96 and a Subscribe & Save price of $14.21. *Id.* ¶ 3.64. The page also identified numerous third-party sellers offering the same product. *Id.* The prices offered by Amazon were substantially lower than the prices offered by those third-party sellers. *Id.* ¶¶ 3.64-65.



STRITMATTER LAW
3600 15th Ave W, Ste. 300
Seattle, WA 98119
Tel: 206.448.1777




*Id.*

Amazon deliberately prices its own offerings below competing third-party offerings, allowing Amazon's listing to become the Featured Offer and enabling Amazon to secure placement in the Buy Box or otherwise induce subscription. *Id.* ¶ 3.66-67.

### 3. Amazon Then Raises Prices Above Competitive Prices.

When a consumer enrolls in Subscribe & Save, the only disclosures Amazon makes on the listing page are exemplified below:

//

//

//

//

//

//



STRITMATTER LAW
3600 15th Ave W, Ste. 300
Seattle, WA 98119
Tel: 206.448.1777




*Id.* ¶ 3.69.

Amazon uses discounted prices on initial Subscribe & Save purchases to induce consumers to enroll in recurring subscriptions. *Id.* ¶ 3.67. After consumers enroll, Amazon commonly increases the prices for subsequent deliveries, including in circumstances where third-party sellers on Amazon are offering the same product at lower prices. *Id.* ¶ 3.68. Consumers who subscribe to a product may therefore subsequently pay more than the then-current Subscribe & Save or Featured Offer price (the most competitive offer by Amazon's own standards) for the same product, including by the same seller. *Id.* ¶ 3.78. Thus, a consumer could get a lower price by cancelling their existing subscription and immediately creating a new subscription for the identical product. *Id.* Additionally, unlike one-time purchases, recurring Subscribe & Save orders are fulfilled weeks or months after initial enrollment, so consumers receive no corresponding



STRITMATTER LAW
3600 15th Ave W, Ste. 300
Seattle, WA 98119
Tel: 206.448.1777

benefit—like rapid delivery—that would justify paying a higher price than the lowest available Subscribe & Save or Buy Box price. *Id.* ¶ 3.79.

An investigation by the House Judiciary Committee's Subcommittee on Antitrust, Commercial, and Administrative Law into Amazon's pricing practices explained this phenomenon. Its Report concluded that Amazon had employed below-cost pricing strategies in multiple areas of its business and observed that such pricing could contribute to customer lock-in within Amazon's marketplace ecosystem. *Id.* ¶ 3.81. The Report observed that once customers become locked into that ecosystem, they may be less likely to alter their purchasing behavior even when Amazon's pricing is no longer competitive. *Id.* ¶ 3.82. The Report explained that "once Amazon succeeds in trapping enough customers . . . to secure dominant position across varied markets, it can then raise prices or remove incentives or allowances for Marketplace sellers to sell products at favorable prices for consumers." *Id.* ¶ 3.83.

**4. Amazon's Fine Print on a Separate Page Violates Federal Standards and Cannot Correct the Deceptive Presentation of "Subscribe & Save."**

a. <u>Amazon's Fine Print Disclosures Violate Federal Standards.</u>

Amazon's fine print on a separate page and not prominently displayed to customers violates Federal Trade Commission and Consumer Financial Protection Bureau standards. *Id.* ¶¶ 3.70-3.71. Both agencies warn of "dark patterns" in subscription models that easily mislead consumers. A CFPB circular cautions that sellers may not "misrepresent or fail to clearly and conspicuously disclose the material terms of an offer for a product or service with a negative option [ongoing subscription until cancellation] feature." Material terms include the amount or range of amounts charged. *Id.* ¶¶ 3.50-3.52. The FTC's guidance under the FTC Act and the Restore Online Shoppers' Confidence Act (ROSCA) advises that "[a]ny express claim or deliberately implied claim is presumed to be material." *Id.* ¶¶ 3.54-3.55. The FTC warns that "the disclosure should be



STRITMATTER LAW
3600 15th Ave W, Ste. 300
Seattle, WA 98119
Tel: 206.448.1777

unavoidable. A disclosure is not clear and conspicuous if a consumer needs to take any action, such as clicking on a hyperlink or hovering over an icon, to see it." *Id.* ¶¶ 3.56-3.57. It should "appear immediately adjacent to the means of recording the consumer's consent for the negative option feature." *Id*. Nothing in Amazon's order page disclosures dispels the overarching premise that consumers will save by subscribing.

b. <u>The "Net Impression" to Ordinary Consumers Is That They Will Save By Subscribing.</u>

Even with Amazon's linked fine print disclosures, an ordinary consumer is given the "net impression" that they can trust Amazon to save when they subscribe. For example, after a customer's initial Subscribe & Save purchase, subsequent recurring orders may be allocated among one or more sellers at Amazon's discretion (to continue providing the Featured Offer price that subscribers expect). *Id.* ¶ 3.72. When a subscription is allocated to a different seller, Amazon may pause future recurring orders under certain circumstances, including where a lower-priced offer is available for the product. *Id.* ¶ 3.73.

Amazon's linked FAQ page also enhances consumers' expectation of savings. Tajea Decl. Ex. 4. Amazon boasts "Save time and money" and "Subscribe more. Save more." Amazon urges consumers to "[u]nlock extra savings on eligible subscriptions when you receive five or more products in one auto-delivery." Amazon advises that the price may increase or decrease "depending on the Amazon.com price of the item at the time we process your order," which directly conflicts with Amazon's practice of charging more than consumers would pay for individual orders or re-enrolling in Subscribe & Save on Amazon.com. Compl. ¶ 3.78.

Amazon's separate links give ordinary consumers to the "Subscribe & Save" program the "net impression" that they can trust Amazon to save money. *Id.* ¶ 3.75. If this were billed as the "Whatever Amazon Wants" program, the fine print Amazon cites could more easily be construed



STRITMATTER LAW
3600 15th Ave W, Ste. 300
Seattle, WA 98119
Tel: 206.448.1777

the way Amazon portrays it—as complete, unquestionable control. But all such disclosures must be viewed from the ordinary consumer's perspective under the overarching premise that consumers will save money by subscribing.

**5. Amazon's Pre-Fulfillment Emails Do Not Correct the "Subscribe & Save" Deception and Instead Continue to Deceive Consumers.**

Amazon sends subscribers notifications before recurring orders are fulfilled. *Id.* ¶ 3.77. These communications reinforce the impression that the subscription price reflects the current market price for the product, with a discount, i.e., a discount under the Featured Offer price Amazon uses as a comparator to the Subscribe & Save price. In reality, the price charged exceeds other prices then-available on Amazon.com for the same product, including the Featured Offer price or new Subscribe & Save enrollments. *Id.* Nothing in the emails explains that consumers may pay more than Featured Offer (one-time purchase). Instead, the emails reference specific Subscribe & Save discounts (*e.g.*, 15%) applicable to the updated price, reinforcing the false impression that consumers are saving money with the program and do not need to check current Featured Offer or Subscribe & Save prices (the most competitive offers by Amazon's own standards). *Id.* ¶ 4.13. In other words, when Amazon tells subscribers what the price is, they have no reason to suspect that it is not the same price being told to other visitors to Amazon.com.[3]

**6. Subscription Models Pose Increased Risk to Consumers.**

Amazon's deception is especially potent in a subscription model. Ordinary consumers associate subscription programs with ongoing savings, particularly when those programs are expressly marketed as providing discounts. *Id.* ¶ 3.48. For example, Amazon markets Prime

[3] If necessary, Plaintiffs request leave to add detail to the Complaint about the fulfillment email. For example, the email states, "Prices go up or down over time, but you'll always get your Subscribe & Save savings on top of current price." This expressly reinforces the consumer expectation that they will have savings over current Amazon prices, i.e., the one-time "Featured Offer" price Amazon advertised as a comparator and which is, by Amazon's standards, the most customer-preferred offer.



STRITMATTER LAW
3600 15th Ave W, Ste. 300
Seattle, WA 98119
Tel: 206.448.1777

membership to include "exclusive deals & savings" on "thousands of items," savings on groceries, savings on fuel, and savings on pharmacy orders. Amazon also offers discounted prices on year-long subscriptions compared to monthly renewal. *Id.*

Subscription programs can influence consumer purchasing behavior by creating incentives for customers to remain enrolled over time, often referred to as "consumer inertia." *Id.* ¶ 3.49. As one consumer-behavior study explained:

> [T]he decision to remain subscribed is rarely a purely rational cost-benefit analysis. Instead, psychological biases such as 'loss aversion' (the reluctance to lose access to a service once acquired), 'status quo bias' (the preference for maintaining existing arrangements), and the 'sunk-cost effect' (the tendency to persist because of past payments) play critical roles in extending customer tenure. Simultaneously, design features like free trials, tiered pricing, and auto-renewal exploit these biases, nudging consumers to commit even when perceived value begins to decline.

*Id.*

These characteristics make consumers particularly vulnerable to deceptive descriptions and inadequate disclosures. *Id.* What the largest retailer in the world argues is an adequate disclosure does not reflect the reality of the ordinary consumer.[4]

---

[4] Although not strictly necessary to substantiate Plaintiffs' CPA claims, for context, the Complaint alleges that Amazon exercises extensive control over product prices, on and off its website. This facilitates its Subscribe & Save bait-and-switch and dispels the notion that the largest retailer in the world is a mere bystander to market changes affecting Subscribe & Save prices.

Amazon exercises control over third-party sellers through its Amazon Business Solutions Agreement ("BSA"), which sellers must accept before offering products on Amazon's marketplace. *Id.* ¶ 3.22. From 2012 until March 2019, Amazon's BSA included a "Price Parity Provision." *Id.* ¶ 3.23. That provision required a seller's price on Amazon to be "at least as favorable to Amazon Site users as the most favorable terms" offered by the seller through other sales channels. *Id.* Although Amazon later removed the Price Parity Provision from the BSA, Amazon continues to maintain pricing restrictions through other policies incorporated into the BSA, including Amazon's Seller Code of Conduct, Marketplace Fair Pricing Policy, and Standards for Brands selling in the Amazon Store. *Id.* ¶ 3.24.

Amazon has used this policy to exert influence over product pricing outside of the Amazon marketplace. *Id.* ¶ 3.38. An investigation by the State of California uncovered substantial evidence that Amazon coerces its vendors to manipulate prices outside the Amazon Store, allowing Amazon to "match" artificially high prices. *Id.* For example, Amazon instructs its vendors to increase retail prices at other stores, make products temporarily unavailable to drive up prices, or remove products from competing retailers. *Id.*

This level of control over pricing is not disclosed to consumers and is not something ordinary consumers would expect. And although intent is not a required element of the CPA, these details demonstrate that Subscribe & Save price changes are not exclusively market forces to which Amazon is a mere bystander. Rather, Amazon controls its market—and beyond.



STRITMATTER LAW
3600 15th Ave W, Ste. 300
Seattle, WA 98119
Tel: 206.448.1777

### B. Plaintiffs Reasonably Expected to Save by Enrolling in Subscribe & Save.

Plaintiffs enrolled in Amazon's Subscribe & Save program for recurring purchases of Lavazza Espresso Ground Coffee (ASIN B001EQ5ERI) (the "Product"), selecting deliveries every two months. *Id.* ¶ 4.2. Plaintiffs selected the Subscribe & Save option because, based on the product listing and their understanding of the program, it appeared to offer a discounted price that was and would remain at or near the lowest price available on Amazon.com. *Id.* ¶ 4.3. By enrolling in a recurring subscription at a discounted price, they expected that the product's initial price was reasonably consistent with anticipated future prices and was not artificially reduced to induce enrollment in the subscription program. *Id.* ¶ 4.5. Plaintiffs also reasonably expected that Amazon would continue to use its marketplace tools and seller-selection processes to secure a price at or near the lowest price available on Amazon for future purchases of the Product. *Id.* ¶ 4.6.

The Product was offered for sale on Amazon.com by both Amazon and multiple third-party sellers. *Id.* ¶ 4.4. On February 11, 2024, Plaintiffs purchased the Product through Subscribe & Save after Amazon.com displayed a One-Time Purchase price of $19.53 and a 15% Subscribe & Save discount, resulting in a Subscribe & Save purchase price of $16.60. *Id.*

At the time of Plaintiffs' initial purchase, Amazon's was the Featured Offer and so sold the Product Plaintiffs purchased through Subscribe & Save. *Id.* ¶ 4.7. On April 11, 2024, Amazon sold Plaintiffs' next recurring order of the Product. *Id.* ¶ 4.8. Amazon listed the Product at $20.05 and applied a 15% Subscribe & Save discount, resulting in a purchase price of $17.04. *Id.* On July 26, 2024, Amazon again sold Plaintiffs' recurring order, listing the Product at $25.00 and applying a 15% Subscribe & Save discount, resulting in a purchase price of $21.25. *Id.* ¶ 4.9.

Plaintiffs allege that, throughout the relevant period, the Product was also available through multiple third-party sellers on Amazon, including through the Subscribe & Save program. *Id.* ¶



STRITMATTER LAW
3600 15th Ave W, Ste. 300
Seattle, WA 98119
Tel: 206.448.1777

4.10. On October 20, 2024, Amazon sent Plaintiffs an email at 8:54 PM concerning an upcoming Subscribe & Save delivery with the subject line: "Price changes: review your upcoming delivery." *Id.* ¶ 4.11. The email stated that Plaintiffs' previous purchase price for the Product had been $21.25 and that the new Subscribe & Save price would be $28.69. *Id.* ¶ 4.12. According to the email, October 20, 2024, was also the final day on which Plaintiffs could manage that upcoming recurring order. *Id.* ¶ 4.13. The notice provided no information about other offers available on Amazon.com and no meaningful opportunity to evaluate competing offers either on Amazon.com or elsewhere before the recurring order was processed. *Id.* ¶ 4.14.

Later that night, Amazon automatically processed Plaintiffs' recurring Subscribe & Save order. *Id.* ¶ 4.15. Amazon sold the Product at a listed price of $33.75 and applied a 15% Subscribe & Save discount, resulting in a purchase price of $28.69. *Id.* In other words, over the course of four deliveries, Amazon increased the Product's One-Time Purchase price and Subscribe & Save purchase price by 73%. *See id.* On October 20, 2024, Plaintiffs separately purchased the identical Product from third-party seller "Wiki Deals" on Amazon.com for $25.90. *Id.* ¶ 4.17.[5] Plaintiffs allege that Amazon never adequately disclosed that the same Product could be purchased from other sellers on Amazon.com at prices lower than the one charged through Plaintiffs' recurring Subscribe & Save order. *Id.* ¶ 4.18.

Amazon's misrepresentations, omissions, and concealment of material information regarding Subscribe & Save pricing caused Plaintiffs to believe that they would save money by enrolling in Subscribe & Save. *See id.* ¶ 4.19. That incorrect belief caused Plaintiffs to pay more for the Product than they otherwise would have paid and were injured as a result. *Id.*

---

[5] If necessary, Plaintiffs request leave to amend the Complaint to specify that this was the Featured Offer price, i.e., the most customer-preferred offer by Amazon's own standards. The Subscribe & Save fulfillment therefore charged more than the comparator Featured Offer price that Subscribe & Save is advertised to beat.



STRITMATTER LAW
3600 15th Ave W, Ste. 300
Seattle, WA 98119
Tel: 206.448.1777

## III. ISSUE PRESENTED

Have Plaintiffs alleged sufficient facts under the Federal Rule of Civil Procedure 12(b)(6) standard to support a claim under Washington's Consumer Protection Act ("CPA"), Revised Code of Washington section 19.86 *et seq*.? (Yes.)

## IV. EVIDENCE RELIED UPON

This response is based on the papers and pleadings of this case.

## V. ARGUMENT AND AUTHORITY

### A. Federal Rule of Civil Procedure 12(b)(6) Standard.

A Rule 12(b)(6) motion to dismiss is properly granted if the complaint does not "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face if it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* To be plausible, facts must be more than "merely consistent with" a defendant's liability. *Id.*

### B. Elements of Washington CPA Claims.

To prevail on a private claim under the Washington Consumer Protection Act, a plaintiff must establish five elements: (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a person's business or property, and (5) causation. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 533 (Wash. 1986). The Legislature enacted the CPA to "protect the public and foster fair and honest competition." Wash. Rev. Code Ann. § 19.86.920 (West). The CPA is to be "liberally construed that its beneficial purposes may be served." *Id.*



STRITMATTER LAW
3600 15th Ave W, Ste. 300
Seattle, WA 98119
Tel: 206.448.1777

Regarding the first element, "[d]eception exists 'if there is a representation, omission or practice that is likely to mislead" a reasonable consumer.'" *Panag v. Farmers Ins. Co. of Washington*, 204 P.3d 885, 895 (Wash. 2009). "[A] communication may be **deceptive** by virtue of the 'net impression' it conveys, even though it contains truthful information." *Id.* (collecting FTC cases). "[A] plaintiff 'need not show that the act in question was *intended* to deceive, but that the alleged act had the *capacity* to deceive a substantial portion of the public.'" *Behnke v. Ahrens*, 294 P.3d 729, 734 (Wash. Ct. App. 2012) (simplified). When assessing whether an act has the capacity to deceive, courts consider an ordinary consumer's perspective. *Panag*, 204 P.3d at 895. In doing so, they "look not to the most sophisticated readers but rather to the least." *Id.* (simplified).

"The universe of '**unfair**' business practices is broader than, and encompasses, the universe of 'deceptive' business practices." *Id.* at 896. Courts use two tests to determine whether conduct is unfair under the CPA. *Greenberg v. Amazon.com, Inc.*, 553 P.3d 626, 640-41 (Wash. 2024). Under the "substantial injury test," an act or practice is unfair if "[1] the act or practice causes or is likely to cause substantial injury to consumers [2] which is not reasonably avoidable by consumers themselves and [3] not outweighed by countervailing benefits to consumers or to competition." *Id.* at 641 (simplified). Under the broader "*S&H* test," a practice is unfair if "the practice, without necessarily having been previously considered unlawful, offends public policy," or if it is "immoral, unethical, oppressive, or unscrupulous." *Id.* at 639 (simplified).[6]

The statute defines "**trade or commerce**" broadly: "the sale of assets or services, and any commerce directly or indirectly affecting the people of the state of Washington." Wash. Rev. Code Ann. § 19.86.010(2) (West).

[6] *Greenberg* explains, "A jury decides whether a particular act is unfair in situations where a plaintiff advances a claim that is not regulated by statute or some other well-established source of public policy, and where the underlying facts regarding the defendant's conduct is disputed." *Id.* at 647.



STRITMATTER LAW
3600 15th Ave W, Ste. 300
Seattle, WA 98119
Tel: 206.448.1777

Finally, the **public interest** element is met when the act or practice: (1) Violates a statute that incorporates this chapter; (2) Violates a statute that contains a specific legislative declaration of public interest impact; or (3)(a) Injured other persons; (b) had the capacity to injure other persons; or (c) has the capacity to injure other persons. Wash. Rev. Code. Ann. § 19.86.093 (West).

**C. Plaintiffs' Claims Establish CPA Liability.**

There can be no question that Amazon's Subscribe & Save program is part of "trade or commerce" as defined by statute. Similarly, Amazon's practice applies to thousands (if not millions) of Subscribe & Save customers establishes the public interest element under Washington Revenue Code section 19.896.093(3). *See also* Compl. ¶ 5.4

Amazon's Subscribe & Save bait-and-switch is also both unfair and deceptive. To start, ordinary consumers—particularly the least sophisticated consumers—expect to save money on repeat purchases by signing up for "Subscribe & Save." Second, Amazon markets enrollment in the program with a percentage discount over the One-Time Purchase price, which suggests actual savings through enrollment. Third, that One-Time Purchase price is often an artificially low and unsustainable price, very different from what consumers would receive on subsequent fulfillments. This is done to induce subscription, reliance on Amazon, and profit from consumer inertia. Fourth, pre-fulfillment emails continue to report percentage discounts through Subscribe & Save, even though consumers could get a better price through individual orders—or even cancelling and re-enrolling in Subscribe & Save—with current Featured Offer Amazon.com prices, i.e., those Amazon deems most preferable to consumers. The emails continue to give consumers the impression that they are saving money over Featured Offer prices—advertised as comparators for the savings of Subscribe & Save—and do not need to monitor Amazon.com prices.



STRITMATTER LAW
3600 15th Ave W, Ste. 300
Seattle, WA 98119
Tel: 206.448.1777

Similarly, Amazon's FAQ page, which contains images and more understandable language for consumers than pages like the Conditions of Use, reinforces consumers' expectation of savings. Taneja Decl. Ex. 4. After repeatedly advertising savings, Amazon explains that price changes depend "on the Amazon.com price." The "Amazon.com" price consumers are shown on enrollment is the Featured Offer. From the perspective of the ordinary consumer, the FAQs directly contradict Amazon charging Subscribe & Save enrollees higher prices than the Featured Offer price or re-enrollment in a subscription—the most competitive and best offers by Amazon's own standards.

In short, Amazon induces a subscription with artificially low prices, a promise of savings, and a subscription discount, and then raises prices above the most customer-preferred offers by Amazon's own standards. This classic bait and switch "offends public policy," is "unscrupulous" by any definition, and meets every requirement of the substantial injury test.

**1. Fine Print Disclosures Do Not Remedy Prominent Deception.**

Amazon's argument largely rests on fine print disclosures on a separate web page. But Washington law rejects reliance on fine print disclosures overwhelmed by affirmatively misleading messages. And federal law rejects inconspicuous linked disclosures for subscriptions.

In *State v. LA Invs., LLC*, 410 P.3d 1183 (Wash. Ct. App. 2018), the court held that a company's mailers—which bore prominent official-sounding language, governmental formatting, and urgent directives—were deceptive as a matter of law under the CPA, notwithstanding several disclaimers embedded in the document. *Id.* at 1193-96. Disclaimers "are inadequate unless they are 'sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression.'" *Id.* at 1195 (citing *Removatron Int'l Corp. v. Fed. Trade. Comm'n*, 884 F.2d 1489, 1497 (1st Cir. 1989)).



STRITMATTER LAW
3600 15th Ave W, Ste. 300
Seattle, WA 98119
Tel: 206.448.1777

In *LA Invs., LLC*, the disclaimers were insufficient because the dominant deceptive elements overshadowed them. *Id.* at 1195. Furthermore, "both experts acknowledged that consumers do not read every word or read in detail the content of documents," and one expert observed, "a more effective way of correcting misperceptions is to design the mailer in such a way that there is no initial misperception." *Id. See also State v. Mandatory Poster Agency, Inc.*, 398 P.3d 1271, 1278-80 (Wash. Ct. App. 2017) (affirming that mailer was deceptive even with a disclaimer because the overall tone, imagery, and language created the net impression that it was a mandatory government form); *Fed. Trade Comm'n v. Doxo, Inc.*, 771 F. Supp. 3d 1162, 1180-81 (W.D. Wash. 2025) (disclaimers scattered throughout the payment process were insufficient to cure the deceptive net impression that Doxo was an official payment channel for consumers' billers, citing the rule that disclaimers must be sufficiently prominent and unambiguous to change the apparent meaning of the claims).

Similarly, *Fed. Trade Comm'n v. Amazon.com, Inc.*, 735 F. Supp. 3d 1297 (W.D. Wash. 2024), concerned Amazon's free trial of Prime that automatically converted into a paid subscription, which it only disclosed during the product-checkout process in small print in black and white against a visually dominant checkout process that could lead a reasonable consumer to believe that subscribing was the only path to completing a purchase. *Id.* at 1318-20. The court held that the FTC adequately alleged that Amazon's enrollment disclosures were not "clear and conspicuous" under ROSCA and the reasonable consumer standard.[7]

---

[7] "[K]nowing failure to reveal something of material importance is 'deceptive' within the CPA." *See Robinson v. Avis Rent a Car Sys., Inc.*, 22 P.3d 818, 824 (Wash. Ct. App. 2001); *see also* Compl. ¶ 3.52 (quoting *Consumer Financial Protection Circular 2023-01*, Consumer Fin. Protection. Bureau (Jan. 19, 2023), https://www.consumerfinance.gov/compliance/circulars/consumer-financial-protection-circular-2023-01-unlawful-negative-option-marketing-practices) ("Sellers may violate the CFPA's prohibition on deceptive acts or practices if they misrepresent or fail to clearly and conspicuously disclose the material terms of an offer for a product or service with a negative option feature."). These disclosures also violate the FTC's requirement that disclosures be



STRITMATTER LAW
3600 15th Ave W, Ste. 300
Seattle, WA 98119
Tel: 206.448.1777

Amazon's disclosures here also fail federal standards for subscription disclosures established by the FTC and CFPB. *See supra*. Those standards inform Washington's CPA. *See* Wash. Rev. Code Ann. § 19.86.920 (West) ("It is the intent of the legislature that, in construing this act, the courts be guided by final decisions of the federal courts and final orders of the federal trade commission interpreting the various federal statutes dealing with the same or similar matters.").

Nothing in Amazon's disclosures adequately correct the misleading representation of "Subscribe & Save." The linked disclosures do not inform consumers that even with supposed discounts, Amazon may charge more than new Subscribe & Save enrollment and more than One-Time Purchase prices used as the comparator for savings—the most customer-preferred offers by Amazon's own standards.

**2. Amazon's Other Arguments Depend on Misconstruing Plaintiffs' Claims.**

Most of Amazon's cite cases are inapposite because they pertain to claims Plaintiffs do not make. For example, Amazon correctly acknowledges that Plaintiffs are not claiming a defect or misrepresentation about the product they purchased, *see* Def. Mtn. at 7, but Amazon's standing argument relies primarily on "price premium" cases—cases in which it is alleged that a product is worth less than what the consumer paid for it due to a misrepresentation or omission *about the product itself*.[8] These cases are irrelevant because Plaintiffs do not allege that the product they

---

"unavoidable" and that a disclosure is inadequate if it requires consumers to take any action, "such as clicking on a hyperlink or hovering over an icon, to see it." Compl. ¶ 3.56 (quoting *Enforcement Policy Statement Regarding Negative Option Marketing*, Fed. Trade Commission at 11 (2021), https://www.ftc.gov/system/files/documents/public_statements/1598063/negative_option_policy_statement-10-22-2021-tobureau.pdf).

[8] *See, e.g.*, *Cahen v. Toyota Motor Corp.*, 717 F. App'x 720, 723 (9th Cir. 2017) ("For their UCL, CLRA, and FAL claims, plaintiffs allege that they suffered an injury because they either would not have purchased their vehicles or would have paid less for them had they known about these hacking risks."); *Desrys v. Traditional Medicinals, Inc.*, No. 25-CV-07898-HSG, 2026 WL 1387413, at *1 (N.D. Cal. May 18, 2026) (alleging "Plaintiff and other



STRITMATTER LAW
3600 15th Ave W, Ste. 300
Seattle, WA 98119
Tel: 206.448.1777

received was defective or inferior. Rather, Plaintiffs paid more than the most customer-preferred offer by Amazon's own standards, because Amazon made misrepresentations that they would save by subscribing.[9]

Amazon also likens this case to *Estate of Storey v. Amazon.com*, 2025 WL 887373, where consumers sued when they did not receive the product ordered in the specified delivery window—even though Amazon provided no such guarantee. This analogy quickly unravels compared to the affirmatively misleading presentation of Subscribe & Save. To start, in its prior order, 2024 WL 2882270, the court explains how it was undisputed that the plaintiff's order did not qualify for "Guaranteed Delivery," and the consumer's checkout page did not describe the delivery time as "guaranteed." *Id*. at *3. The CPA claim failed because Storey relied on a "guarantee" that did not exist and mere confusion by consumers. *Id*. at * 6-7.

After Storey amended his complaint, his allegations still rested on "Amazon's failure to abide by promises it did not make" regarding guaranteed delivery. 2025 WL 887373 at *3. Storey also argued an ordinary consumer would expect an "automatic refund" or fee credit when delivery is delayed, but he never requested a refund through the process Amazon provided. *Id*. at *3-4. The court emphasized, "the terms governing Storey's order contemplate his situation (delayed

---

consumers paid a price premium as a result of Defendant's unlawful labeling of the Products"); *Naimi v. Starbucks Corp.*, 798 F. App'x 67, 69 (9th Cir. 2019) ("Plaintiffs have plausibly alleged that the canned beverage contains less than two shots of Starbucks brand espresso, thus rendering the label's implied representation false."); *Morehouse v. Apple, Inc.*, No. 25-CV-02988-NW, 2026 WL 2111332, at *2 (N.D. Cal. July 22, 2026) ("Plaintiffs have not shown that the e-books and audiobooks have 'an actual defect' or are 'worth less than what' Plaintiffs paid.").

[9] *See also Associated Indem. Corp. v. Del Guzzo*, 81 P.2d 516, 526 (Wash. 1938) ("A duty to speak may arise from partial disclosure, the speaker being under a duty to say nothing or to tell the whole truth. One conveying a false impression by the disclosure of some facts and the concealment of others is guilty of fraud, even though his statement is true so far as it goes, since such concealment is in effect a false representation that what is disclosed is the whole truth.").



STRITMATTER LAW
3600 15th Ave W, Ste. 300
Seattle, WA 98119
Tel: 206.448.1777

delivery) and provide a method by which he could remedy that situation (a refund request)." *Id*. at *5.[10]

Unlike in *Storey*, Plaintiffs' claims do not rest on unstated assumptions, but rather on Amazon's affirmatively misleading conduct in a subscription model. An ordinary consumer would not expect to sign up for "Subscribe & Save," illustrated repeatedly by price discounts, to pay *more* than the most customer-preferred prices by Amazon's own standards. Plaintiffs' claims do not rest on common knowledge that deliveries do not always go as planned and can be remedied in the Amazon app, but rather, consumers reasonably believing that they can rely on Amazon to save by subscribing. And unlike the process to request a refund of the delivery fee in *Storey*, Amazon fails to demonstrate any consumer process that encompasses ongoing price manipulation and refunds for consumable goods—not just with one order but with *past orders of a subscription*. Amazon does not contend that consumers could or should be required to seek a refund on consumed coffee or compare *past* fulfillment prices with *past* Amazon prices.[11] That kind of analysis is why people hire lawyers, and is what discovery is for.

---

[10] This does not mean, however, that the CPA requires that the plaintiff attempt a refund or even pay at all before bringing a claim. Rather, consequences flowing from the deceptive conduct sufficiently state injury under the CPA. *See*, *e.g.*, *Panag*, 166 Wn.2d 27, 65 (holding "a CPA plaintiff alleging deceptive collection methods need not remand payment to establish injury").

*Storey* also relied on *Shields v. Fred Meyer Stores Inc.*, 741 F. Supp. 3d 915 (W.D. Wash. 2024), for the proposition that having to request a refund is not "unfair" because the refund makes injury reasonably avoidable. *Storey v. Amazon.com*, 2025 WL 887373, at *4. However, *Shields* did find *deceptive* conduct to satisfy CPA liability based on affirmative misrepresentations by Fred Meyer employees. 741 F. Supp. 3d at 932.

[11] Amazon's cited cases on these issues are inapplicable because they involve sellers' alleged failure to disclose information that was readily available to the plaintiff or common knowledge, not instances that involved misrepresentations and omissions. *See, e.g.*, *Fabozzi v. StubHub, Inc.*, No. C-11-4385 EMC, 2012 WL 506330, at *6 (N.D. Cal. Feb. 15, 2012) ("Stubhub has submitted numerous screenshots of its website demonstrating that it effectively discloses the information Plaintiff alleges it conceals."); *Cole v. Keystone RV Co.*, No. C18-5182 TSZ, 2021 WL 3111452, at *4 (W.D. Wash. July 22, 2021), *aff'd*, No. 21-35701, 2022 WL 4234958 (9th Cir. Sept. 14, 2022) (facts about mold, formaldehyde, and prolonged occupancy in RVs is available in owner's manual, which is also available online); *Moore v. Trader Joe's Co.*, 4 F.4th 874, 883 (9th Cir. 2021) ("A reasonable consumer would not understand Trader Joe's label here as promising something that is impossible to find."); *Ebner v. Fresh, Inc.*,



STRITMATTER LAW
3600 15th Ave W, Ste. 300
Seattle, WA 98119
Tel: 206.448.1777

Most importantly, the CPA does not require consumers to uncover such a deception. *See supra*; *see also Young v. Toyota Motor Sales, U.S.*, 472 P.3d 990 (Wash. 2020) (finding affirmative misrepresentations deceptive, and noting in the first line of the opinion, "'Buyer beware' is not the law in the state of Washington"); *McGinity v. Procter & Gamble Co.*, 69 F.4th 1093, 1097-98 (9th Cir. 2023) (consumers only need to consider additional information when disclosures are ambiguous); *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 939 (9th Cir. 2008) ("We disagree . . . that reasonable consumers should be expected to look beyond misleading representations on the front of the box to discover the truth from the ingredient list in small print on the side of the box.").[12]

Finally, Amazon relies heavily on *Taylor v. Amazon.com, Inc.,* No. 2:24-CV-00169-MJP, 2025 WL 104381, at *4 (W.D. Wash. Jan. 15, 2025), which also involved claims related to Amazon's Buy Box. But those claims are fundamentally different, and the court's reasoning supports Plaintiffs' claims here. In *Taylor*, the plaintiffs alleged that Amazon does not always show the lowest available price among all sellers in the Buy Box, deceiving customers into falsely believing that the Buy Box is the lowest available price. *Id.* at *2. As explained above, Amazon described the Buy Box as essentially its evaluation of the most preferable offers to consumers. *Taylor* shows a product listing page clearly depicting both the Buy Box and, below that, "Other Sellers" with a comparison price listed. *Id.* The court rejected the plaintiffs' claims because Amazon could have legitimate business reasons to prominently display a certain offer over others, and the other offers were accessible from the same page. *Id.* at *4. The court likened this practice

838 F.3d 958, 965 (9th Cir. 2016) ("Plaintiff's claim that the reasonable consumer would be deceived as to the amount of lip product in a tube of Sugar is not plausible.").

[12] Amazon also urges that Plaintiffs allege they were misled into believing that prices would not go up, which no reasonable consumer would believe. Amazon cites numerous irrelevant cases in which courts have held that consumers understand that prices fluctuate. *See, e.g.*, *Wood v. Blue Diamond Growers*, 722 F. Supp. 3d 554, 562 (D. Md. 2024); *Fabozzi v. StubHub, Inc.*, 2012 WL 506330, at *6 (N.D. Cal. Feb. 15, 2012).



STRITMATTER LAW
3600 15th Ave W, Ste. 300
Seattle, WA 98119
Tel: 206.448.1777

to a retailer's choice to display products in a way that promotes one product while minimizing others. *Id.* at *5.

Unlike in *Taylor*, Amazon affirmatively deceives consumers with promises of price savings over the Buy Box to entice them to enroll in Subscribe & Save. Consumers then end up paying more than Buy Box prices. Second, the comparison pricing for other sellers in *Taylor* is prominently listed on the same page, whereas here, Amazon relies on fine print at other pages—that fails to correct the net impression of savings. Third, subscription enrollment is not a buyer-directed process like a customer traveling through retail aisles or personally reviewing Amazon sellers before adding a product to their cart. It is a system directed by Amazon without active engagement by the consumer, which is the design—and danger—of the subscription model.[13]

**D. Plaintiffs' Claims Establish Causation and Injury.**

"Causation under the CPA is a factual question to be decided by the trier of fact." *Deegan v. Windermere Real Est./Ctr.-Isle, Inc.*, 391 P.3d 582, 587 (Wash. Ct. App. 2017). "The plaintiff must establish that, but for the defendant's affirmative misrepresentation, the plaintiff would not have suffered an injury. Reliance is one way to establish this causal link." *Deegan v. Windermere Real Est./Ctr.-Isle, Inc.*, 391 P.3d 582, 587 (Wash. Ct. App. 2017) (footnote omitted). "But causation is different for omissions of material fact." *Id.* "Federal cases discussing the CPA acknowledge a rebuttable presumption of reliance for material omissions." *Id.* at 588.

[13] Other courts have found that "fake discounts" are deceptive under the CPA. *See Fitzgerald v. Shade Store, LLC*, No. C23-1435RSM, 2024 WL 3540540, at *2 (W.D. Wash. July 25, 2024); *Nemykina v. Old Navy, LLC*, 461 F. Supp. 3d 1054, 1061 (W.D. Wash. 2020). The Ninth Circuit agrees. *See Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1105–06 (9th Cir. 2013), *as amended on denial of reh'g and reh'g en banc* (July 8, 2013) ("Misinformation about a product's 'normal' price is, therefore, significant to many consumers in the same way as a false product label would be."); *Montes v. Sparc Grp., LLC*, 136 F.4th 1168, 1173–74 (9th Cir. 2025), *certified question answered*, 586 P.3d 999 (2026) ("[M]isinformation about a product's regular or original price affects the consumer's valuation of the product."). *Montes* is addressed further *infra*.



STRITMATTER LAW
3600 15th Ave W, Ste. 300
Seattle, WA 98119
Tel: 206.448.1777

Plaintiffs have adequately alleged that they relied on Amazon's misrepresentations that they would save money by enrolling in Subscribe & Save. Compl. ¶¶ 4.14, 6.16. But for Amazon's deceptive conduct in misrepresenting and omitting material information concerning prices, Plaintiffs would not have continued subsequent purchases through Subscribe & Save. *Id.* ¶ 6.18.1.

Plaintiff has also adequately alleged injury. "Inducing a plaintiff into spending money she otherwise would not have spent, based on a misrepresentation, is clearly a cognizable injury." *Nemykina v. Old Navy, LLC*, 461 F. Supp. 3d 1054, 1061 (W.D. Wash. 2020). Plaintiffs allege that Amazon's Subscribe & Save price on subsequent orders was greater (even accounting for discounts) than contemporaneous prices offered by Amazon and third-party sellers. Compl. ¶¶ 3.78, 4.15-4.17. They paid more than they would have or should have due to Amazon's deception—more than competitive prices, and more than the most customer-preferred offers by Amazon's own standards. *Id.* at ¶ 4.19, 3.77, 3.15, 3.44.

Plaintiffs suffered concrete harm in the form of lost money from the payment of Amazon's inflated prices. Amazon's deceptive conduct thus directly caused Plaintiffs' harm. *Id.* ¶ 6.18.2. Similarly, while Amazon alleges that Plaintiff "received the coffee they intended to buy at the price they agreed to pay," Def. Mtn. at 1, Amazon gave Plaintiffs less than 24 hours to review fulfillment pricing such that they had no "genuine opportunity to seek better prices on Amazon or elsewhere." Compl. ¶ 4.13-4.14. Even if Plaintiffs had agreed to pay that price, successful deception to induce that agreement is not a defense to CPA claims.

Amazon relies on *Montes v. SPARC Grp. LLC*, 586 P.3d 999 (2026), a case that is easily distinguishable. Answering a certified question from the Ninth Circuit, the Washington Supreme Court held that a consumer who purchased leggings where the seller misrepresented the price history could not, "without more," prove an injury to property. *Id.* at 1002. But the Supreme Court



STRITMATTER LAW
3600 15th Ave W, Ste. 300
Seattle, WA 98119
Tel: 206.448.1777

provided an entire paragraph of examples of what would constitute injury: (1) the product was less valuable than advertised, (2) the product differed from its advertisements, (3) the consumer attempted to return the product for a refund, and (4) the product was "worth less" than the consumer paid. *Id.*

Here, Plaintiffs allege more than "disappointed expectations." They allege they paid more than they would have and more than the reasonable market price for the product by Amazon's own standards. Compl. ¶¶ 4.17-19. They allege widespread price manipulation not just to lure customers into a subscription, which is more dangerous for consumers than picking up some leggings in the mall, but to then inflate prices over market rates. *See supra*.[14]

### E. In the Alternative, Plaintiffs Respectfully Request Leave to Amend.

If the Court grants Amazon's motion, Plaintiffs request leave to amend any deficiencies in their Complaint. *See Naimi v. Starbucks Corp.*, 798 F. App'x 67, 70 (9th Cir. 2019) ("Because it is not clear that amendment would be futile, Plaintiffs should be afforded an opportunity on remand to amend their complaint to allege the necessary factual details . . . ."); *Bacon v. Woodward*, 104 F.4th 744, 753 (9th Cir. 2024) ("Leave to amend shall be freely given when justice so requires, and this policy is to be applied with extreme liberality.").

## VI. CONCLUSION

Plaintiffs' Complaint adequately alleges CPA liability, causation and injury. The Court should deny Amazon's Motion to Dismiss.

---

[14] Defendant's "standing" argument with respect to causation and damages (as opposed to injunction) is a red herring. "[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Kirola v. City & Cnty. of San Francisco*, 860 F.3d 1164, 1174 (9th Cir. 2017) (quoting *Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)). Plaintiffs have clearly pleaded concrete, actual harm caused by Amazon that can be redressed by the CPA.



STRITMATTER LAW
3600 15th Ave W, Ste. 300
Seattle, WA 98119
Tel: 206.448.1777

DATED this 11th day of September, 2026.

STRITMATTER LAW

*s/ Andrew Ackley*
Andrew Ackley, WSBA #41752
*s/ Brad J. Moore*
Brad J. Moore, WSBA #21802
*s/ Darcy Covert*
Darcy Covert, WSBA#57137

3600 15th Ave West, Suite 300
Seattle, WA 98119
Phone: 206.448.1777
Fax: 206.728.2131
andrew@stritmatter.com
brad@stritmatter.com

LEVIN SEDRAN & BERMAN LLP

*s/ Daniel C. Levin*
Daniel C. Levin, Esq.
*s/ Nicolas J. Elia*
Nicholas J. Elia, Esq.

510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel. (215) 592-1500
dlevin@lfsblaw.com
nelia@lfsblaw.com

ROBERT PEIRCE & ASSOCIATES, P.C.

*s/ D. Aaron Rihn*
D. Aaron Rihn, Esq.
*s/ Sara J. Watkins*
Sara J. Watkins, Esq.
*s/ Stanley D. Ference IV*
Stanley D. Ference IV, Esq.

707 Grant Street, Suite 125
Pittsburgh, PA 15219
Tel. (412) 281-7229
arihn@peircelaw.com
swatkins@peircelaw.com
mference@peircelaw.com